**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for MONTGOMERY BANK & TRUST,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION NO. _____** |
| **v.** | ) ) ) | |
| **REBECCA CHAMPION, LARRY D. COLEMAN, TRAE DOROUGH, JOHN FALK, MICHAEL GUNTER, GREGORY A. MORRIS, LLOYD E. MOSES, THOMAS A. PETERSON III, MILLER P. ROBINSON, JOHN L. ROBISON, JR., JOHN TYSON,** | ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Montgomery Bank & Trust, for its Complaint, states as follows:

**I.  INTRODUCTION**

1.     The Federal Deposit Insurance Corporation ("FDIC") brings this case in its capacity as Receiver ("FDIC-R") for Montgomery Bank & Trust ("MBT" or "the Bank") of Ailey, Georgia, pursuant to authority granted by 12 U.S.C. § 1821.

2.      In this action, the FDIC-R seeks to recover damages from eleven former directors and officers of MBT (collectively, "Defendants"), whose negligence, gross negligence and breaches of fiduciary duty allowed non-party Aubrey Lee Price ("Price") to misappropriate $14,700,000 from the Bank between January 2011 and May 2012.

3.      Price's misappropriation was carried out by means of seventeen wire transfers, in which the Bank's money was transferred under false pretenses into an account owned by Price's hedge fund PFG, LLC ("PFG"), and controlled by Price.

4.      These seventeen wire transfers were made based on the Bank's understanding that the money was being transferred into an account in the Bank's name at Goldman Sachs Execution & Clearing, L.P. ("GSEC"), and that the money would be used to purchase United States Treasury securities and similar conservative investments for the Bank.  However, no such account was ever established for the Bank at GSEC, and no such conservative securities were purchased on the Bank's behalf.

5.      Price lost much of the misappropriated $14,700,000 through high-volume day trading in risky securities.  He used the remainder to pay investors who were redeeming shares from his hedge fund, and to finance his personal and business expenses.

6.      In June 2012, Price ran out of money, disappeared, and sent several purported suicide notes admitting to the fraud.  He was later apprehended and pleaded guilty to bank fraud, securities fraud, and wire fraud.

7.      Defendants, through their negligence, gross negligence, and breaches of fiduciary duty enabled Price to misappropriate the Bank's funds.  Defendants failed to oversee the Bank's investment activities, failed to comply with an FDIC Cease & Desist Order, failed to comply with internal Bank policies, failed to create functioning oversight committees, and otherwise

abdicated their responsibilities, thereby allowing Price to easily misappropriate $14,700,000 of the Bank's money for his own use.

## II.  THE PARTIES

**A.    Plaintiff**

8.     The FDIC is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811- 1835(a).    On July 6, 2012, MBT was closed by the Georgia Department of Banking and Finance ("GDBF") and the FDIC was appointed receiver.  Pursuant to 12 U.S.C. §1821(d)(2)(A)(i), the FDIC, by operation of law, succeeded to all rights, titles, powers and privileges of the Bank, and, among others, the depositors, account holders, and stockholders of the Bank.

**B.    Defendants**

9.     Defendant Champion was a member of the Bank's Board of Directors ("Board") from January 18, 2011 until failure.  She was a member of the Board's Special Compliance Committee from May 9, 2011 until failure.

10.     Defendant Coleman was a director of the Bank from 2003 until failure.  He was a member of the Board's Asset/Liability Committee ("ALCO") and the Special Compliance Committee throughout the relevant time.

11.     Defendant Dorough became the Bank's Chief Executive Officer and President in 2009, and served in those capacities until failure.  He also served as a director of the Bank from August 2009 until failure.  He was a member of the ALCO at all relevant times, and was a member of the Special Compliance Committee from May 9, 2011 until failure.

12.     Defendant Falk was a director of the Bank from April 1, 2011 until failure.

13.     Defendant Gunter was a director of the Bank from January 18, 2001 until failure, and served as Chairman of the Board from September 12, 2011 until failure.  He was a member of the Special Compliance Committee from at least January 30, 2012 until failure.

14.     Defendant Morris was a director of the Bank from 1993 until failure, and served on the Special Compliance Committee from at least October 13, 2009 until May 9, 2011, and from January 30, 2012 until failure.

15.     Defendant Moses was a director of the Bank from 1991 until failure.  He served on the Special Compliance Committee from October 13, 2009 until May 9, 2011.

16.     Defendant Peterson was a director of the Bank from 1984 until failure.  He was a member of the Special Compliance Committee throughout the relevant time.

17.     Defendant Robinson was a director of the Bank from April 8, 2008 until November 1, 2011, and served as Chairman of the Board from April 14, 2009 until August 8, 2011.  He served on the Special Compliance Committee from October 13, 2009 until May 9, 2011.

18.     Defendant Robison was a director of the Bank from 1998 until failure, and was a member of the ALCO throughout the relevant time.   (The above Defendants are sometimes collectively referred to as the "Director-Defendants.")

19.     Defendant Tyson was the Bank's Chief Operating Officer, and a member of the ALCO, from January 18, 2011 until failure.  He was a member of the Special Compliance Committee from at least January 30, 2012 until failure.  Although Tyson was not a member of the Bank's Board of Directors, he received or reviewed the relevant pre-meeting Board packages and was present at the relevant meetings discussed herein.

### III.  JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C.

§ 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a

corporation organized and existing under the laws of the United States and brings this action in

its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the

laws of the United States.   The FDIC, including in its capacity as Receiver, has the authority to

sue and complain in any court of law.  12 U.S.C. § 1819.

21.     This Court has personal jurisdiction over Defendants, who at all relevant times

were residents of the State of Georgia and who conducted business in the State of Georgia.

22.     Venue is proper in the Southern District of Georgia pursuant to 28 U.S.C.

§ 1391(b)(1) because certain of the Defendants reside in this District.  In addition, venue is

proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because all or substantially all of the

acts alleged herein occurred in, and the claims asserted herein, arose in this District.

### IV.  FACTUAL BACKGROUND

23.     MBT, a state-chartered bank, obtained FDIC deposit insurance on October 8,

1965.  It was a wholly-owned subsidiary of Montgomery County Bankshares, Inc. ("MCBI").

24.      Beginning in 2004, MBT's management made numerous commercial real estate

loans, which later resulted in large losses.

25.     A May 4, 2009 Report of Examination ("RoE") issued by the FDIC downgraded

MBT to a composite CAMELS 5 rating, primarily due to a dramatic increase in losses on

commercial real estate loans.

26.     "CAMELS" is an acronym for Capital, Asset Quality, Management, Earnings,

Liquidity and Sensitivity.   Bank examiners evaluate these aspects of a bank's condition and

performance to assess a bank's safety and soundness and risk to the FDIC Deposit Insurance Fund.

27.     A composite CAMELS 5 is the worst possible rating and reflects extremely unsafe and unsound practices or conditions, and critically deficient performance.  Banks rated a CAMELS 5 pose a significant risk of loss to the Deposit Insurance Fund.

28.     The May 4, 2009 RoE warned the Board, including Defendants Coleman, Morris, Moses, Peterson, Robinson and Robison, that the Bank's critical condition was caused by inadequate Board supervision, ineffective leadership, and unsatisfactory policies and practices.

29.     On September 28, 2009, the Bank's Board, including Defendants Coleman, Dorough, Morris, Moses, Peterson, Robinson and Robison, consented to a Cease & Desist Order ("C&D Order"), which required the Board to remedy its inadequate oversight of the Bank.

30.     The 2009 C&D Order remained in effect throughout the relevant time.  All Defendants had actual or constructive knowledge of the C&D Order and its requirements during their tenure as officers and directors of the Bank.

31.     The 2009 C&D Order required the directors to review and approve the Bank's investment activity every month, and to document their review and approval in the Board minutes.  No such review occurred.

32.     The 2009 C&D Order required the directors to form a committee consisting of a majority of independent directors to supervise management's compliance with the Bank's investment policies.  No proper committee was ever established, nor was there any supervision of management's compliance with the Bank's investment policies.

33.     The 2009 C&D Order required the directors to establish a Special Compliance Committee to monitor the Bank's progress in complying with the C&D Order.  The committee

was required to obtain monthly compliance reports from management, present those reports to the full Board, and document such reports in the minutes.   Although a Special Compliance Committee was established, it rarely met.

34.    In December 2010, Price's investment company, PFGBI, LLC ("PFGBI"), purchased a controlling interest in the Bank's holding company for $10.2 million.

35.    On January 15, 2011, Price recommended to Defendants Robinson and Dorough that the Bank open an account at GSEC, to be brokered through ConvergEx Prime Services, LLC ("ConvergEx"), an introducing broker.  Price stated that the account, which he would manage, would hold $8 million to $10 million in fixed income securities.

36.    Without consulting or seeking approval from the ALCO or the Board, Robinson allowed Dorough and Price to decide whether to open the GSEC account.  Dorough then approved Price's request for the Bank to open such an account.

37.    The first regular Board meeting after the PFGBI acquisition occurred on January 18, 2011.  Each of the Defendants was present, except Falk who joined the Board in April 2011.

38.    At the January 18, 2011 Board meeting, Price discussed his investment background and affiliation with Montgomery Asset Management LLC, f/k/a PFG Asset Management, LLC ("MAM").

39.    At the January 18, 2011 Board meeting, Price was elected to the Board and appointed Chairman of the ALCO, the committee responsible for supervising and approving investments, and ensuring adherence to the Bank's Investment Policy.

40.    On or about January 20, 2011, Price sent Dorough a Prospective Client Application ("Application"), which Price had obtained from ConvergEx, for the purported purpose of opening an account for the Bank at GSEC.

41.     The Application identified the Bank as the client and Dorough as the sole "Principal" authorized to act for the Bank.  Price was authorized to buy and sell securities for the Bank within the account once it was opened.

42.     In the Application, Dorough requested online access to the Bank's GSEC account, and requested email delivery of all prospectuses, disclosures, account statements, confirmations and notices regarding the account.  Dorough signed the Application on January 21, 2011, and sent it to Price, who submitted it to ConvergEx.

43.     On January 25, 2011, Price stated to Dorough that the GSEC account would be opened that day and recommended to Dorough that the Bank wire $5,000,000 of its funds into this new account to invest in a mutual fund holding short-term government securities.

44.     In accordance with Price's recommendation, Dorough directed Bank staff to transfer $5,000,000 into an account at GSEC designated by Price, without receiving or requesting confirmation from GSEC or ConvergEx that an account had been opened in the Bank's name.

45.     In fact, there was no such account in the Bank's name and the money was instead wired -- per Price's instructions -- into PFG's existing hedge fund account at GSEC, No. 7LXS-5519, which Price controlled and used for high-volume day trading in speculative securities.

46.     By February 3, 2011, GSEC had still not acted on the Bank's Application.  On that date, Price directed ConvergEx to disregard the Bank's Application, which ConvergEx promptly did.  As a result, no account was ever opened for the Bank at GSEC.

47.     At a March 8, 2011 Board meeting, at Price's request, Defendants serving at the time authorized MAM and one of its investment advisors to purchase securities for the Bank, even though Price, as an ALCO member, would be responsible for reviewing and authorizing his

own firm's investments.  Defendants Morris and Peterson, who were absent from this meeting, learned of this action the following month (when they received the March 8, 2011 board minutes) and raised no objection.

48.     From July 2011 through May 2012, the Bank made numerous wire transfers into PFG's GSEC account, believing it was the Bank's own account, resulting in a loss of $14,700,000.

49.     From January 2011 until June 2012, none of the Defendants contacted ConvergEx or GSEC, or directed that they be contacted, to verify that an account had been opened in the Bank's name.

50.     From January 2011 until June 2012, none of the Defendants contacted ConvergEx or GSEC, or directed that they be contacted, for any purpose.

51.     Upon information and belief, from January 2011 until June 2012, Defendants Coleman, Falk, Gunter, Morris, Moses, Peterson and Robison, due to their abdication of fiduciary responsibility, were unaware that Price had control over a large portion of the Bank's capital in an account at GSEC.  Defendants Dorough and Robinson, and on information and belief Defendants Champion and Tyson, believed, based on Price's misrepresentations, that Price was investing the Bank's funds in Treasury securities at GSEC.

52.     Price gave the Bank fictitious account statements that purported to represent the Bank's GSEC account.  The statements included fabricated account balances and transaction activity for the conservative investments that Price purportedly purchased for the Bank.  These statements often contained typographical errors, inconsistent account numbers, and erroneous dates.

53.     Defendants either did not review these monthly statements or carelessly overlooked the errors that were apparent on the face of the statements, thereby allowing Price to continue misappropriating the Bank's funds.  Although Dorough had requested that copies of all statements and other communications be emailed to him from GSEC or ConvergEx, Dorough never followed up on this request.  Instead, all information concerning the account came from Price.   The other Defendants, due to their inattention, were unaware of this fundamental breakdown in the Bank's internal controls.

54.     Below is a table of the relevant transactions that identifies the Defendants who served as officers and/or directors at the time of each transaction.  Each transfer comprised a substantial percentage of the Bank's Tier 1 capital at the time.  By August 15, 2011, the cumulative transfers exceeded the Bank's Tier 1 capital.

**Table 1**

| Transfer Date | Notes | Transfer Amount (Millions) | Tier 1 Capital (%) | Defendants' Tenure (✔ = ALCO) | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | ✔ | ✔ | | | | | | | ✔ | ✔ |
| | | | | B. Champion | L. Coleman | T. Dorough | J. Falk | M. Gunter | G. Morris | L. Moses | T. Peterson III | M. Robinson | J. Robison, Jr. | J. Tyson |
| Jan. 25, 2011 | 1 | $5.000 | 29.85 | x | x | x | | x | x | x | x | x | x | x |
| Apr. 2011 | 1, 2 | ($5.000) | 79.36 | x | x | x | x | x | x | x | x | x | x | x |
| July 22, 2011 | | $0.500 | 7.94 | x | x | x | x | x | x | x | x | x | x | x |
| Aug. 8, 2011 | | $5.000 | 79.36 | x | x | x | x | x | x | x | x | x | x | x |
| Aug. 15, 2011 | | $1.500 | 23.81 | x | x | x | x | x | x | x | x | x | x | x |
| Sept. 14, 2011 | | $0.150 | 2.38 | x | x | x | x | x | x | x | x | x | x | x |
| Dec. 2, 2011 | | $2.500 | 52.61 | x | x | x | | x | x | x | x | | x | x |
| Dec. 28, 2011 | | $0.250 | 5.26 | x | x | x | x | x | x | x | x | | x | x |
| Jan. 9, 2012 | 1 | $2.200 | 57.94 | x | x | x | x | x | x | x | x | | x | x |
| Feb. 24, 2012 | 1 | $3.000 | 79.01 | x | x | x | x | x | x | x | x | | x | x |
| Mar. 2, 2012 | 3 | ($2.200) | 57.94 | x | x | x | x | x | x | x | x | | x | x |
| Mar. 22, 2012 | 1 | $1.200 | 31.60 | x | x | x | x | x | x | x | x | | x | x |
| May 1, 2012 | | $0.600 | 16.70 | x | x | x | x | x | x | x | x | | x | x |
| **Net Total** | | **$14.700** | | | | | | | | | | | | |

Note 1:   On these dates, several transfers were made equaling the total indicated.

Note 2:   On April 6 and 8, 2011, the $5,000,000 wired out on January 25, 2011 was returned to the Bank.

Note 3:   This $2,200,000 was a partial return of the funds misappropriated on February 24, 2012.

**A.     Defendants' Violations of Bank Policy Enabled Price's Misappropriation.**

55.     The Bank's Funds Management Policy established the ALCO.  The ALCO was responsible for, among other things, the Bank's asset and liability mix, which included oversight of investments.

56.     At all relevant times, the Funds Management Policy required the ALCO to meet "on call" and at least quarterly.  The Funds Management Policy also required the ALCO to keep appropriate minutes and to provide them to the Board.

57.     The Bank's Investment Policy and Procedures ("Investment Policy") placed ultimate responsibility for the Bank's investments with the Board.  Under the Investment Policy, President Dorough was authorized to make investments for the Bank with the guidance of and approval from the ALCO.

58.     From January 2011 through June 2012, the ALCO consisted of Defendants Coleman, Dorough, Robison and Tyson, along with Price and the Bank's Chief Accounting Officer.

59.     In violation of MBT's Funds Management Policy, MBT's Investment Policy, and prudent banking standards, the Defendant ALCO members met only twice in 2011, and never met at all in 2012.

60.     In violation of MBT's Funds Management Policy, MBT's Investment Policy, and prudent banking standards, the Defendant ALCO members provided no guidance or oversight as to the Bank's investments.

61.     Had the Defendant ALCO members adhered to MBT's Funds Management Policy, MBT's Investment Policy, and prudent banking standards, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

62.     At all relevant times, the Defendants who did not serve on the ALCO knew or should have known that the ALCO was not functioning, but took no action to enhance their own oversight of the Bank's investment function or to require the Defendant ALCO members to adhere to Bank policies and do their job.

63.     Had the Defendants who did not serve on the ALCO taken appropriate action to enhance their own oversight of the Bank's investment function and/or required the Defendant ALCO members to adhere to Bank policies, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

64.     Georgia banking regulations and MBT's Investment Policy prohibited Defendants from using broker-dealers, such as GSEC, as custodians for more than $500,000 in securities.  At all relevant times, Defendants, through their negligence, gross negligence, and breaches of fiduciary duty, permitted Price to transfer and maintain more than $500,000 in a GSEC account in violation of this regulation and MBT's Investment Policy.  Had Defendants met their obligations, and adhered to Georgia banking regulations and the Bank's Investment Policy, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

**B.     Defendants' Violations of the C&D Order Enabled Price's Misappropriation.**

65.     The Director-Defendants violated the 2009 C&D Order in that they failed to review or approve the Bank's investment activity.  Had the Director-Defendants adhered to the C&D Order, and properly monitored the Bank's investment activity, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

66.     The Director-Defendants violated the 2009 C&D Order in that they failed to establish an independent committee to oversee compliance with the Bank's investment policies. The ALCO was not independent, met only twice during the relevant period, failed to oversee compliance with the Bank's Investment Policy, and failed to consider any of the purported investments at issue.  Had the Director-Defendants established a functioning independent

committee to oversee investments, as required by the 2009 C&D Order, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

67.     The Defendants on the Special Compliance Committee violated the 2009 C&D Order because the committee did not meet in 2011, met only twice in 2012, and failed to receive any proper reports on management's compliance with the C&D Order, including its investment provisions.  Had the Defendants on the Special Compliance Committee performed their function, as required by the 2009 C&D Order, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

68.     The Director-Defendants violated the 2009 C&D Order by providing inaccurate information to the FDIC and GDBF in required quarterly progress reports.  The Director-Defendants submitted these reports to the FDIC in February 2011, April 2011, July 2011, September 2011, December 2011, and March 2012.  In each of these reports, the Director-Defendants serving at the time stated that they had increased their oversight and were actively participating in the affairs of the Bank, including the Bank's investment function, when they were not.  Had the Director-Defendants taken an increased and active role in the Bank's investments as they represented to the FDIC, Price's misappropriations would not have occurred, and the Bank's losses would have been avoided.

**C.     Defendants' Abdication of Responsibility and Failure to Adhere to Safe and Sound Banking Practices Enabled Price's Misappropriation.**

69.     Each of the Defendants abdicated their responsibilities to MBT and failed to adhere to safe and sound banking practices.

70.     The Defendant ALCO members abdicated their responsibilities and violated prudent banking standards in that they failed to hold regular meetings, failed to oversee the Bank's investments, failed to appropriately supervise management with respect to the Bank's

investment function, failed to adhere to the C&D Order, failed to comply with Bank policies, and permitted Price to exercise excessive control over the investment function.

71.     The Director-Defendants abdicated their responsibilities and violated prudent banking standards in that they failed to oversee the Bank's  investment function, failed to establish an independent functioning ALCO, failed to adhere to the C&D Order, failed to comply with Bank policies, and permitted Price to exercise excessive control over the investment function.

72.     Had Defendants not abdicated their responsibilities, and adhered to safe and sound banking practices, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

**D.     Defendants Failed to Inquire into Very Substantial Investment Activity.**

73.     During the relevant period, Defendants were regularly notified that very substantial investment activity was occurring at the Bank, yet failed to inquire into or meaningfully review this activity.

74.     Defendants were provided pre-meeting Board packages for each month they served as a director or officer of the Bank.  These Board packages cited very substantial investment activity, including the investments purportedly made through Price.  For example,

    a.    The Board package for the March 8, 2011 meeting indicated that the Bank had invested $5,000,000 in mutual funds, which represented approximately 30 percent of the Bank's Tier 1 capital at the time.

    b.    The Board package for the April 11, 2011 meeting indicated that the purported $5,000,000 mutual fund investment had been sold, and that $33,443 of income had been earned in a "Goldman Sachs" account.

    c.    The Board package for the September 12, 2011 Board meeting indicated there had been a new investment of over $7,000,000 in Treasury securities.

75.     Similar information was also reflected in the Bank's quarterly Call Reports, which Defendants serving at the time had access to and were required to review.

76.     Defendants serving at the time failed to discuss, consider, review or prevent the foregoing fictitious investments by Price.  Even if these investments had not been fictitious, they would have violated Georgia banking regulations, the Bank's policies, and prudent banking practices.

77.     Had Defendants serving at the time reviewed or inquired into these transactions, as required by prudent banking practices, the C&D Order, and the Bank's Investment Policy, they would have learned that GSEC was holding Bank funds far in excess of the $500,000 permitted under Georgia banking regulations and the Bank's Investment Policy.

78.     Had Defendants serving at the time of these transactions learned that GSEC held more than $500,000 of the Bank's funds, they would have adhered to Georgia banking regulations and the Bank's Investment Policy and required that the excess funds be returned to the Bank and that no further unlawful investments be made with GSEC.

79.     Had Defendants serving at the time reviewed or inquired into these transactions, as required by prudent banking practices, the C&D Order, and the Bank's Investment Policy, they would also have learned that:

> a.     The purported investments had not been submitted to, reviewed or approved by the ALCO;
>
> b.     Bank accounting personnel had no direct contact with GSEC or ConvergEx, and all communications, including account statements, flowed through Price;
>
> c.     The Bank received no separate transaction confirmations of the investment purchases from any source; and
>
> d.     The Bank's accounting personnel were unable to reconcile the bond valuations in Price's GSEC statements with genuine values provided by the Bank's independent valuation service.

80.     Had Defendants serving at the time of these transactions learned the foregoing facts, at a minimum they would have been required to: (a) insure that management and a properly constituted ALCO comply with the C&D Order, the Bank's Investment Policy, prudent banking practices, and the applicable laws and regulations; and (b) insure that the Bank's accounting personnel obtained proper account statements and confirmations directly from ConvergEx and/or GSEC and were thereby able to reconcile the discrepancies in the Bank's general ledger accounts.

81.     Had Defendants serving at the time acted properly, Price's misappropriations would not have occurred and the Bank's losses would have been avoided.

82.     Later Board packages contained similar information.  For example:

a.      The Board package for January 9, 2012 reflected a $10 million increase in the Bank's mutual funds, an amount that exceeded the Bank's Tier 1 capital.

b.      The Board packages for January and February 2012 indicated that Treasury securities increased by over $15 million (850%), and mutual funds decreased by almost $10 million (99%).  The Balance Sheet in the February Board package also indicated that total "Investment Securities" increased by over $5 million.

c.      The February 2012 Board package included an investment summary indicating that GSEC was holding more than $500,000 of the Bank's funds in violation of Georgia banking regulations and the Bank's Investment Policy.  This information was also provided in March and April 2012, coinciding with other purported bond purchases by Price.

83.     Defendants serving at the time failed to discuss, consider, review or prevent the foregoing fictitious investments by Price.  Even if these investments had not been fictitious, they would have violated Georgia banking regulations, the Bank's policies, and prudent banking practices.

84.     Had Defendants serving at the time reviewed or inquired into these transactions, as required by prudent banking practices, the C&D Order, and the Bank's Investment Policy,

they would have learned that GSEC was holding Bank funds far in excess of the $500,000 permitted under Georgia banking regulations and the Bank's Investment Policy.

85.   Had Defendants serving at the time of these transactions learned that GSEC held more than $500,000 of the Bank's funds, they would have adhered to Georgia banking regulations and the Bank's Investment Policy and required that the excess funds be returned to the Bank and that no further unlawful investments be made with GSEC.

86.   Had Defendants serving at the time of these transactions reviewed or inquired, as required by prudent banking practices, the C&D Order, and the Bank's Investment Policy, they would also have learned the facts alleged in paragraph 79 above.

87.   Had Defendants serving at the time of these transactions learned the foregoing facts, at a minimum they would have been required to: (a) insure that management and a properly constituted ALCO comply with the C&D Order, the Bank's Investment Policy, prudent banking practices, and the applicable laws and regulations; and (b) insure that the Bank's accounting personnel obtained proper account statements and confirmations directly from ConvergEx and/or GSEC and were thereby able to reconcile the discrepancies in the Bank's general ledger accounts.

88.   Had Defendants serving at the time of these transactions acted properly, Price's misappropriations would not have occurred, the remaining portion of the misappropriated funds would have been recovered, and future misappropriations would have been avoided.

89.   From April 2011 through January 2012, every monthly Board package included an extraordinary gain and loss schedule ("Schedule") with a line item referring to the Bank's purported GSEC account.  The line item always included a marginal note that the "account is now closed."   The Schedule showed $34,443 income in March 2011 and $0 for each month

thereafter until December 2011, when the Schedule showed $225,602 of "Income from Goldman Sachs -- account is now closed."  Defendants serving at the relevant times failed to discuss, consider, review or approve, or document in the minutes, the purported GSEC account or investment activity.

90.     Defendants serving in January 2012 did not question how a closed account could generate $225,602 in income, nor did the members of the ALCO (or any other Defendants on the Board at the time) question why an investment generating $225,602 in income had not been presented to the ALCO for approval.

91.     Had Defendants serving at the time of these transactions acted properly, Price's misappropriations would not have occurred, the remaining portion of the misappropriated funds would have been recovered, and future misappropriations would have been avoided.

## V.  CAUSES OF ACTION

### Count One

### Ordinary Negligence Under Georgia Law

92.     The FDIC-R incorporates by reference herein each of the allegations set forth above.

93.     As officers and/or directors of the Bank, Defendants owed the Bank and its depositors, account holders, and stockholders a duty of care under O.C.G.A. §§ 7-1-490, 51-1-2, and other provisions of Georgia law, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  The circumstances here included the Bank having: (a) a composite CAMELS 5 rating; (b) dangerously depleted capital; (c) a history of inadequate Board oversight and supervision of Bank operations, including investments, and regulatory criticism thereof; (d) a C&D Order requiring increased

Board oversight and supervision of Bank operations, including investments; and (e) a dominant Board member and ALCO member acting as the Bank's outside investment advisor, resulting in a conflict of interest and a breakdown in internal controls.

94.     Defendants' acts and omissions described herein exhibit the absence of such diligence, care and skill as would constitute ordinary negligence under Georgia law even for officers and directors of a financially stable bank, much less a deeply troubled bank such as MBT under the circumstances described above.

95.     Defendants are not entitled to the application of the business judgment rule. Defendants failed to make decisions about investments after proper deliberation or the requisite diligence to ascertain and assess the facts and circumstances upon which to base such decisions. With respect to the process by which Defendants made investment decisions, they failed to exercise the diligence, care and skill of ordinarily prudent bank directors and officers acting under similar circumstances.

96.     As a direct and proximate result of Defendants' ordinary negligence, the FDIC-R has suffered damages of $14,700,000.

## Count Two

### Gross Negligence Under Georgia Law and 12 U.S.C. § 1821(k)

97.     The FDIC-R incorporates by reference herein each of the allegations set forth in paragraphs 1 through 91 above.

98.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that

degree of care which every person of common sense, however inattentive he or she may be, would exercise under the same or similar circumstances. O.C.G.A. § 51-1-4. The circumstances here included the Bank having: (a) a composite CAMELS 5 rating; (b) dangerously depleted capital; (c) a history of inadequate Board oversight and supervision of Bank operations, including investments, and regulatory criticism thereof; (d) a C&D Order requiring increased Board oversight and supervision of Bank operations, including investments; and (e) a dominant Board member and ALCO member acting as the Bank's outside investment advisor, resulting in a conflict of interest and a breakdown in internal controls.

99.     Defendants' acts and omissions described herein exhibit such a degree of carelessness and/or inattention as would constitute gross negligence under Georgia law even for officers and directors of a financially stable bank, much less a deeply troubled bank such as MBT under the circumstances described above.

100.     As a direct and proximate result of Defendants' gross negligence, the FDIC-R has suffered damages of $14,700,000.

## Count Three

## Breach of Fiduciary Duty

101.     The FDIC-R incorporates by reference herein each of the allegations in paragraphs 1 through 91 above.

102.     As officers and/or directors of the Bank, Defendants owed the Bank a duty to act with the utmost good faith, honesty, and loyalty in the management, supervision, and conduct of the Bank's business, property and financial affairs.

103.     Defendants' fiduciary duties included, among other things: conducting the business of the Bank in a manner consistent with prudent banking practices, the C&D Order, and

the Bank's Investment Policy; using prudent procedures to review and approve investments; and acting with the requisite care in the discharge of those duties.

104.    The Bank reasonably reposed trust and confidence in each of the Defendants and believed that they would exercise the trust and confidence reposed in them with great care.

105.    Defendants each knew or should have known that the Bank was placing its trust and confidence in them, and the Bank did place its trust and confidence in each of them, as demonstrated by the fact that each of the Defendants was an officer and/or a director of the Bank and had the responsibility to review and approve investments, and prevent inappropriate investments.

106.    By their acts and omissions described herein, Defendants failed and neglected to fulfill their respective fiduciary duties. Defendants allowed the Bank's assets to be misappropriated by failing to review and prevent the investments made through Price, without adherence to prudent banking practices, the C&D Order, and the Bank's Investment Policy, among other things.

107.    The acts and omissions Defendants described herein constitute breaches of their fiduciary duties.  As a direct and proximate result of Defendants' breaches of their fiduciary duty, the FDIC-R has suffered damages of $14,700,000.

## VI.  JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R respectfully demands a trial by jury for all issues in this case that are so triable.

## VII.  PRAYER FOR RELIEF

The FDIC-R respectfully requests a money judgment against each Defendant for $14,700,000, together with appropriate interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, prejudgment interest, and such other and further relief as the Court deems just and proper.

Respectfully submitted, this 1st day of July, 2015.

**BOUHAN FALLIGANT LLP**

**/s/ Todd M. Baiad**
TODD M. BAIAD
Georgia Bar No.:  031605
LUCAS D. BRADLEY
Georgia Bar No.: 672136
*Attorneys for Plaintiff Federal Deposit*
*Insurance Corporation, as Receiver for*
*Montgomery Bank & Trust*

BOUHAN FALLIGANT, LLP
P.O. Box 2139
Savannah, GA 31402-2139
Phone:  912-232-7000
Fax:  912-233-0811
tmbaiad@bouhan.com
ldbradley@bouhan.com

Of Counsel:

Alan F. Curley (Pro Hac Vice request pending)
Robinson Curley & Clayton, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
acurley@robinsoncurley.com
(312) 663-3100 – telephone
(312) 663-0303 – facsimile